Fourth Court of Appeals
San Antonio, Texas



## MEMORANDUM OPINION

No. 04-19-00587-CV

**IN THE INTEREST OF B.T.K.**, a Child

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-00374
Honorable Peter Sakai, Judge Presiding

Opinion by:   Irene Rios, Justice

Sitting:   Rebeca C. Martinez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: February 26, 2020

AFFIRMED; MOTION TO DISMISS GRANTED

Appellant Mother appeals the trial court's order terminating her parental rights to her child,

Brady.[1]  Mother challenges the sufficiency of the evidence supporting the trial court's finding that

termination was in the child's best interest as well as the sufficiency of the evidence supporting

the statutory predicate grounds for termination.  We affirm the trial court's order.

### BACKGROUND

The Texas Department of Family and Protective Services (the "Department") initially

became involved in the underlying case on February 24, 2018, when the Department received a

---

[1] To protect the identity of a minor child in an appeal from an order terminating parental rights, we refer to the parents as "Mother" and "Father" and the child by the alias "Brady."  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).  The trial court's order terminates both Mother's and Father's parental rights to Brady, and both Mother and Father filed notices of appeal.  Father, however, filed a motion to dismiss his appeal, which we grant.

referral alleging neglectful supervision by Mother. The referral alleged Mother left Brady in the care of C.N. who overdosed while Brady was in his care.

On February 23, 2018, San Antonio Police Department ("SAPD") Officer Christopher Loyd responded to a report of an overdose at Mother's residence. When Officer Loyd arrived at the residence at approximately 10:00 p.m., he found C.N., the overdose victim, and a small child, later identified as Brady.[2] Mother was not present but arrived approximately an hour to an hour and a half after being contacted. Officer Loyd observed Brady asleep "in a crib." The officer noted he found a residual leafy substance in the second bedroom — the room in which Brady was not sleeping – and observed the room smelled of "green," or unsmoked, marijuana. Officer Loyd also observed different types of drugs and possible drugs, which the officer described as trace amounts of powdery substance, "pills with impressions on them consistent with Xanax," and a spoon consistent with drug paraphernalia and indicative of heroin injections. Officer Loyd notified the Department because he was concerned by the presence of drugs, possible drugs, and drug paraphernalia in the residence.

Department Investigator Thania Perez went to Mother's residence the following day, February 24, 2018, with two SAPD officers. Perez smelled cigarette smoke when Mother answered the door. Inside the residence, Perez observed multiple ashtrays throughout the residence, a bullet in an ashtray, and a white pill on the counter. Perez described the residence as cluttered with debris on the floor. Brady was in a "pack 'n play" that Perez characterized as not safe for sleeping. Perez was not able to locate any other "crib" in the residence.

Mother informed Perez that she knew C.N. used heroin in the past but believed he was no longer using heroin. Mother also informed Perez that she left Brady with C.N. for only an hour,

---

[2] Brady was ten months' old at the time of removal and two years' old at the time of the trial.

which Perez noted was inconsistent with other reports.  According to Perez, Mother indicated her awareness of Brady's asthma but said she smoked outside or in the bathroom or bedroom — not in the same room as Brady.  Perez noted that Brady smelled of cigarette smoke at the time of her visit and that his breathing was "raspy and rattled."  Perez described Mother as being "very jittery and visibly shaky" at the time of the visit.  Mother denied to Perez that she had used narcotics but, according to Perez, the results of an instant drug test administered to Mother were inconsistent with Mother's denial.  Officers arrested one of the two men in the residence with Mother for possession of marijuana as well as for having outstanding warrants.  The Department subsequently removed Brady from Mother's care and placed him in foster care.  On February 26, 2018, the Department filed a petition to terminate parental rights.

The trial court held a bench trial on August 19, 2019 through August 21, 2019, at which Mother appeared in person and testified on her own behalf.  The trial court also heard testimony from Perez, SAPD Officers Loyd and White, pulmonologist Dr. Kelly Smith, therapist Victoria Caylor, psychologist Dr. Ann Marie Hernandez, Department caseworker Jennifer Scardino, early childcare specialist Shaye McWhorter, and Brady's foster mother.  On October 8, 2019, the trial court signed an Order of Termination Nunc Pro Tunc terminating Mother's parental rights to Brady.

## ANALYSIS

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §§ 161.001(b), 161.206(a); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).  In this case, the trial court found evidence of two predicate grounds to terminate Mother's

parental rights. The trial court also found termination of Mother's parental rights was in the child's best interest.

Mother contends the evidence is legally and factually insufficient to support the trial court's finding of the statutory grounds for termination of her parental rights pursuant to Texas Family Code sections 161.001(b)(1)(D) and (E). Mother additionally contends the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the child's best interest.

**Standard of Review**

When reviewing the sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency). Further, in a trial to the bench, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Health Tronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 582 (Tex. App.—Austin 2012, no pet.). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We therefore defer to the trial court's judgment regarding credibility determinations. *Id*. at 823-24. While we must detail the evidence relevant to the issue of parental termination when *reversing* a finding based upon insufficient evidence, we need not do so when *affirming* a verdict of termination. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

**Statutory Grounds for Termination**

The trial court found evidence Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child … [and] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child … ." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). While both subsections D and E focus on endangerment, they differ regarding the source and proof of endangerment. Subsection D concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection E, the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *Id*.

***Statutory Subsection D***

The statutory ground for termination found in subsection D allows for termination of parental rights if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). The child's "environment" encompasses the suitability of the child's living conditions and the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D." *Id*. "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection D permits termination

based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

Under subsection D, the trial court examines "evidence related to the environment of the [child] to determine if the environment was the source of endangerment to the [child]'s physical or emotional well-being," although parental conduct can be a factor that contributes to this environment. *J.T.G.*, 121 S.W.3d at 125. The relevant period for review of conduct and environment supporting termination under statutory ground D is before the Department removes the child. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, "a fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent." *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.).

### *Statutory Subsection E*

Subsection E permits termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, endanger means to expose the child to loss or injury or to jeopardize his emotional or physical well-being. *Id.* The trial court must determine "whether evidence exists that the endangerment of the child's physical well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act." *In re M.E.–M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *S.M.L.*, 171 S.W.3d at 477. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger

which the parent is aware of but disregards." *S.M.L.*, 171 S.W.3d at 477. Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after he was removed from a parent's care. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4-5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

***Discussion***

Because the evidence relating to each of the two statutory grounds is interrelated, we consolidate our examination of it. *J.T.G.*, 121 S.W.3d at 126.

Mother admitted during her testimony that she had a previous Department case regarding another child that related to the use of methamphetamine. Mother testified she used methamphetamine during the first three months of her pregnancy with Brady but discontinued using drugs when she learned she was pregnant. However, Mother also admitted that she continued using methamphetamine after Brady's birth and was still using methamphetamine at the time of removal. Mother acknowledged officers found Xanax in her residence at the time of C.N.'s overdose but testified that she was unaware of its presence and stated that she was not using Xanax at that time.

When questioned about C.N., Mother stated C.N. was supposed to be clean. According to Mother, at the time of his overdose, C.N. was "staying there like off and on." Mother testified C.N. stayed with her "for three nights straight, but he didn't stay there … he was hanging around for like a month." However, Dr. Hernandez testified that Mother informed her C.N. had been living with Mother for approximately fifteen months and that Mother admitted she had left Brady in C.N.'s care on occasions prior to the overdose. Mother testified she did not know C.N. smoked marijuana in the house but admitted she smoked cigarettes in the house and allowed drug users to be around Brady without her being present. Mother additionally testified that the man arrested at her residence during Perez's visit was not living with her but was a friend who was there to give

her a ride. According to Officer White, the officers arrested the man because he initially gave them a false name, had outstanding warrants, and was in possession of marijuana.

Following Brady's removal, Mother was detained in the Bexar County Jail relating to a motion to revoke her probation. Mother testified that when she was released, she was transferred to Atascosa County to face charges relating to the possession of Xanax, marijuana, and methamphetamine and the illegal possession of a firearm. Mother equivocated as to whether the charges against her were pending. Mother ultimately testified she was unsure of the status of the charges. Department caseworker Jennifer Scardino testified the charges were still pending at the time of the trial. Mother additionally testified she has not used drugs since her release from jail with the exception of a prescription for Tramadol she received from the emergency room for carpal tunnel syndrome. Mother acknowledged she does not do any repetitive work that would result in carpal tunnel syndrome. Scardino testified Mother did not provide her with any medical documentation, diagnosis, or prescription relating to the carpal tunnel syndrome. According to Scardino, Mother provided only a picture of the prescription bottle with the name of the medication and dosage. Scardino stated that although Mother did not test positive for Tramadol, the use of the medication was troubling because Mother is a recovering addict.

Scardino further testified that, as part of her service plan, Mother was referred for a psychiatric evaluation specifically relating to recommendations made by a COPSD[3] provider during Mother's treatment while she was on probation, as well as recommendations made by her therapist, Victoria Caylor, and her psychologist, Dr. Hernandez. Caylor testified Mother would benefit from psychiatric treatment as Mother's depression and anxiety have not improved without the use of medication. Dr. Hernandez testified she conducted a psychological evaluation of Mother

---

[3] Co-occurring Psychiatric and Substance Abuse Disorders

and diagnosed Mother with bipolar disorder and severe amphetamine use disorder. Dr. Hernandez explained amphetamine disorder is "using a substance to — to the point where it impacts your decision-making ability, your functional capacity — or at a greater rate than you anticipated to the point of intoxication." Dr. Hernandez further explained that a patient can be clean and sober yet still suffer from severe amphetamine disorder, which serves as an indicator of future risk. Dr. Hernandez also testified she recommended psychiatric treatment because Mother suffers from bipolar disorder, which is chronic in nature, and would benefit from both medication and psychotherapy. Mother testified she cancelled her referral appointment with a psychiatrist because she was seeing another doctor who she thought was for the same thing. Scardino testified that, in an attempt to engage Mother, she provided Mother with information regarding the walk-in clinic for the Center for Health Care Services, where Mother was originally referred through the COPSD program for psychiatric services. According to Scardino, Mother again did not follow up.

The trial court also heard testimony that Mother continued smoking after Brady's removal despite Mother's awareness of Brady's asthma diagnosis. Brady's foster mother described a specific occasion on which she and Mother attended an appointment with Brady's pulmonologist. The appointment lasted for two and a half to three hours, during which the foster mother had to excuse herself from the room because of the excessive smell of cigarette smoke from Mother. Brady's breathing was so affected by the smell of the cigarette smoke, his asthma medication dosage was more than doubled following that appointment. Brady's foster mother further testified that, Brady's clothing smelled of cigarette smoke after several visits with Mother.

Dr. Kelly J. Smith, a board certified pediatric pulmonologist who treated Brady for asthma, described the aggravating factors related to Brady's asthma, which included both second-hand and third-hand smoke. Dr. Smith specifically testified that smoke smell on clothing or in furniture, labeled as third-hand smoke, would affect asthma and result in increased coughing, wheezing, and

shortness of breath, which would require increased breathing treatments up to several times a day for at least two days following the exposure.

Mother testified that she had stopped smoking cigarettes and instead, at the time of the trial, vaped. However, Dr. Smith testified that pulmonologists consider vaping as bad as smoking and that vaping also creates third-hand smoke.

Mother admitted that she used methamphetamine during the first three months of her pregnancy and after Brady's birth. Further, the instant drug test administered by Perez was positive for the use of narcotics. *See In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at \*6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) (a parent's drug use can endanger a child's physical or emotional well-being); *J.T.G.*, 121 S.W.3d at 125 (parent's illegal drug use supports conclusion that environment endangers physical or emotional well-being of children). Mother also admitted that she allowed known drug users around Brady and that she was aware of Brady's asthma but nevertheless continued smoking in the residence and subjecting Brady to third-hand smoke. *See S.M.L.*, 171 S.W.3d at 477 (recognizing that a child is endangered when his environment creates a potential for danger of which the parent is aware but consciously disregards). Finally, Mother failed to follow up with recommendations to obtain a psychiatric evaluation to obtain medication as well as therapy to treat her mental health. *S.R.*, 452 S.W.3d at 363 ("Untreated mental illness can expose a child to endangerment … .").

Viewing all the evidence in the light most favorable to the trial court's judgment, we conclude a reasonable trier of fact could have formed a firm belief or conviction Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child … [and] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child … ." Thus, the evidence is legally sufficient to support these

findings. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's termination findings under Sections 161.001(b)(1)(D) and (E).

### The Child's Best Interest

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Family Code section 263.307(b). *See* TEX. FAM. CODE ANN. § 263.307(b). We also consider the *Holley* factors in our analysis.[4] *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id*. In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

---

[4] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id*.

Therapist Victoria Caylor testified Brady attended one therapy session with Mother but would not listen to Mother. Caylor testified Brady pinched and hit Mother but Mother was not able to redirect Brady's behaviors. Brady, however, let Caylor carry him back to his foster mother without exhibiting the same behaviors. Scardino further testified that Brady would not allow Mother to show him any affection unless he was distracted. Brady's foster mother testified that Brady's behavior deteriorated following visits — he cried and exhibited violent behaviors that did not occur prior to visitations with Mother. Scardino testified Brady's current foster family was willing to adopt. Dr. Kelly testified Brady's asthma has improved significantly since his initial visit. Shaye McWhorter with the Brighton Center, an early childcare intervention program, testified Brady initially had a thirty-seven percent delay in communication and language. Brady's foster mother testified that she and her husband had asked the Brighton Center to provide them with additional "homework" to further help Brady thrive. McWhorter testified that Brady's improvement was such that McWhorter believed Brady would no longer need intervention following his yearly reevaluation. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (factfinder may consider whether children have bonded with foster family and are well-cared for when children are too young to express their desires).

The evidence presented during trial showed that although Mother was aware of Brady's asthma, Mother continued to smoke around the child and further subject him to third-hand smoke, which caused an increase in coughing, wheezing, and shortness of breath. Brady's foster mother testified that Brady's clothing smelled like cigarette smoke after several visitations with Mother. *See id*. (providing that a factfinder may infer from a parent's past inability to meet the child's need an inability or unwillingness to meet the child's future needs).

Although Scardino testified Mother completed aspects of her service plan, Scardino expressed concern that Mother failed to seek treatment for her mental health. Mother testified she had been previously diagnosed with depression and anxiety, and Dr. Hernandez testified Mother was diagnosed with bipolar disorder. However, Mother failed to follow through with the referrals provided by the Department. "[A] parent's lack of progress in managing her mental-health conditions is relevant to the best-interest determination." *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *25 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.).

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re H.R.M.*, 209 S.W.3d at 108; *In re J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing an appellate court need not detail the evidence if affirming a termination judgment).

### FATHER'S MOTION TO DISMISS

Father filed a timely notice of appeal but subsequently filed a motion to dismiss his appeal. Father's motion to dismiss his appeal is granted.

**CONCLUSION**

For the foregoing reasons, we grant Father's motion to dismiss and affirm the trial court's order terminating Mother's parental rights.

Irene Rios, Justice